IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| MILTON IRVING FAGIN, INDIVIDUALLY AND AS INDEPENDENT FOR DISTRICT JUDGE 57TH DISTRICT COURT; *Plaintiff*, <br><br> v. <br><br> RUTH R. HUGHS, TEXAS SECRETARY OF STATE; AND GREG ABBOTT, GOVERNOR OF TEXAS; *Defendants*. | SA-20-CV-00765-XR |

## ORDER

On this date, the Court considered Plaintiff's Motion for Preliminary Injunction (ECF No. 3) and Defendants' Response (ECF No. 13). The Court held a hearing on the motion on July 14, 2020. After careful consideration, Plaintiff's motion is **DENIED**.

### BACKGROUND

Plaintiff Milton Irving Fagin ("Plaintiff") is an attorney and an independent candidate for district judge of the 57th District Court of Bexar County, Texas. Plaintiff brings suit against Texas Governor Greg Abbott and Secretary of State Ruth R. Hughs (collectively, "Defendants"), alleging that under the present circumstances of the COVID-19 pandemic—especially in light of the recent surge of cases in San Antonio—Texas' ballot-access requirements for independent candidates violate his rights under the First and Fourteenth Amendments of the U.S. Constitution. ECF No. 1 ¶¶ 85, 90.

The Texas Election Code lays out several requirements for an independent candidate to appear on the general election ballot. First, the candidate must "make a declaration of intent to run

as an independent candidate." TEX. ELEC. CODE § 142.002. Plaintiff timely filed his declaration of intent with the Texas Secretary of State on December 9, 2019 to run in the November 3, 2020 general election. ECF No. 1-1 at 1. An independent candidate must also make a separate application for a place on the ballot, which must be accompanied by a petition containing a minimum number of signatures. TEX. ELEC. CODE §§ 142.004, 142.007. For a district office, the minimum number of signatures is 500. *Id.* § 142.007(2).

Each signer must be a registered voter in the territory of the office sought and must sign their name in their own handwriting. *Id.* §§ 141.063(a)(1), (b). The petition must also include, for each signer, their address, date of birth or voter registration number, the date of signing, and the signer's printed name. *Id.* § 141.063(a)(2). The circulator of a petition must include an affidavit of the circulator stating that the circulator: pointed out and read to each signer, before the petition was signed, each statement pertaining to the signer; witnessed each signature; verified each signer's registration status; and believes each signature to be genuine and the corresponding information to be correct. *Id.* § 141.065(a). A signature on an independent candidate's petition is only valid if: (1) it was signed after the general primary election day or, if a runoff primary is held for the office the candidate is seeking, after the runoff; and (2) the signer did not vote in the general or runoff primary election of a political party that made a nomination, at either primary, for the office sought by the candidate. *Id.* § 142.009. In other words, a circulator collecting signatures for an independent candidate's petition for the general election should only do so after the primary election and from signers who did not vote in that primary.

The application and accompanying petition must be filed within 30 days of the primary election runoff. *Id.* § 142.006. In the case of this year's elections, the runoff occurred on July 14, 2020, so an independent candidate's application and petition with the required signatures must be

filed by August 13, 2020.[1] This means for Plaintiff to be included on the November 3, 2020 general election ballot, he must: collect the minimum 500 signatures in support of his petition, the signatures must be "wet," and the circulator must witness each signature in-person.[2] Plaintiff was allowed to begin collecting signatures on March 4 and he has until August 13 to collect the required signatures and file his application and petition.

In March, the spread of the novel coronavirus across the state of Texas became apparent. In San Antonio, the mayor declared a public health emergency on March 2, 2020. The World Health Organization classified COVID-19 as a worldwide pandemic on March 11, 2020. President Donald Trump declared a national emergency on March 13; that same day, Governor Abbott declared a statewide public health disaster and various city and county officials within the state made emergency declarations. In San Antonio, the mayor limited gatherings of more than 500 people for a one-week period. The state's first coronavirus-related death was reported on March 15; the next day, San Antonio's mayor reduced the cap on social gatherings to 50 people. On March 18, the mayor prohibited indoor dining and closed entertainment venues and bars. On March 19, Governor Abbott issued an executive order instructing Texans to avoid social gatherings and groups of more than 10 people and closing all schools, bars, dine-in restaurants, and gyms.

For a time in late March, the Governor publicly stated he would not implement a statewide "shelter-in-place" or "stay-at-home" order, but would leave that decision to city and county officials. So in Bexar County and San Antonio, there was a mandatory "Stay Home, Work Safe"

---

[1] The runoff election was originally scheduled to occur on May 26, 2020, so the deadline for an independent candidate's application and petition would have fallen in late June. The runoff was postponed due to the COVID-19 pandemic by a proclamation of Texas Governor Greg Abbott and rescheduled for July 14, 2020.

[2] It is not clear from the face of the Texas Election Code that the circulator must witness each signature in-person, but this is the position Defendants took at the hearing held on this motion. The Court reads no such requirement in the Code and asked Defendants whether a circulator of a petition could "witness" a signature using live video technology such as FaceTime or Zoom. Defendants stated that they have interpreted the Code to require signatures to be collected live and in-person. Whether an alternative means would satisfy the Code's "witness" requirement is uncertain, but the issue is not squarely before this Court and remains to be decided.

order in effect from March 24 through April 2. Under that order, residents were ordered to stay home except for "essential" activities, and no gatherings were allowed except for household members.[3]

These local measures were not long-lived, though. On March 31, the Governor issued a statewide executive order, effective April 2, that required Texans to "except where necessary to provide or obtain essential services, minimize social gatherings and minimize in-person contact with people who are not in the same household."[4] Importantly, the order displaced local orders with restrictions that were inconsistent with the statewide order. On April 27, the Governor announced a phased reopening of the Texas economy, permitting a host of establishments to open on May 1. On April 30, the statewide order expired. The reopening continued from May 1 until a "temporary pause" on June 25 due to a surge in cases, hospitalizations, and deaths in the state. An executive order issued on June 26 provides that people "should not be in groups larger than ten and should maintain six feet of social distancing from those not in their group." As with prior executive orders, the Governor's order supersedes any conflicting local restrictions. On July 2, the Governor issued a statewide mandate that Texans in most counties wear face coverings when in public; the order also allows local officials to ban certain outdoor gatherings of over 10 people.

---

[3] Under the "Stay Home, Work Safe" order issued on March 23 (effective March 24), all "individuals living in" the City of San Antonio or Bexar County were "ordered to stay at home consistent with the direction and guidance" in the order. Individuals were allowed to leave their homes only for "Exempted Activities, or to provide or perform Governmental Functions, or to operate Exempted Businesses" as defined in the order. "Outdoor Activity" was exempted, as long as individuals complied with six-feet social distancing requirements. Activity related to elections was not specifically discussed in the order.

[4] The Governor's statewide order defined "essential services" to include everything listed by the U.S. Department of Homeland Security in its Guidance on the Essential Critical Infrastructure Workforce, plus religious services conducted in churches, congregations, and houses of worship. The order did "not prohibit people from accessing essential services or engaging in essential daily activities, such as going to the grocery store or gas station…visiting parks, hunting or fishing, or engaging in physical activity…so long as" necessary precautions were maintained to minimize in-person contact with people not in the same household. Activity related to elections was not specifically discussed in the order.

On June 30, 2020, Plaintiff filed the present suit and a motion seeking a preliminary injunction and/or temporary restraining order to enjoin Defendants from enforcing or applying the challenged provisions of the Texas Election Code that require him to collect voters' signatures. ECF Nos. 1, 3. At bottom, Plaintiff argues that in light of the COVID-19 pandemic it is unconstitutional to require him to gather signatures in order to appear on the ballot as an independent candidate. Plaintiff requests the Court to direct Defendants to (1) accept Plaintiff as an independent candidate for the 57th District Court for the general election ballot without requiring supporting signatures, and (2) place Plaintiff's name on the November 3, 2020 general election ballot in San Antonio, Bexar County, Texas. *Id.* The Court denied the request for a temporary restraining order and set a hearing on the motion for preliminary injunction which was held on July 14, 2020. Plaintiff and counsel for Defendants were present.

## DISCUSSION

### I. Preliminary Injunction Standard

A preliminary injunction will only be granted if the movant demonstrates: "(1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 386 (5th Cir. 2013). The "extraordinary remedy" of a preliminary injunction should not be granted "unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements,'" *id.*, and "unequivocally show[n] the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997).

## II.     Application

   a. Standing

Defendants raise the issue of Plaintiff's standing to bring this suit. "To establish Article III standing, a plaintiff must demonstrate an injury that is: (1) concrete, particularized, and actual or imminent (so-called injury 'in fact'); (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 517 (5th Cir. 2015). It is clear that Plaintiff has standing to bring his claims challenging the constitutionality of the Texas Election Code against Secretary Hughs who "is the chief election officer of the state" charged with administering that same Code. TEX. ELEC. CODE § 31.001. Plaintiff's alleged injury of being excluded from the ballot due to the challenged provisions of the Election Code is "without question, fairly traceable to and redressable by…[the] Secretary of State," who ultimately administers and enforces those provisions. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612–13 (5th Cir. 2017) (rejecting argument that plaintiffs lacked standing to sue Secretary of State over challenged portions of the Texas Election Code).[5]

Defendants also argue that Plaintiff lacks standing to bring claims against Governor Abbott—or alternatively that the Governor is not a proper party—because the Governor does not enforce the relevant portions of the Texas Election Code. ECF No. 13 at 6–8. While that may be true in other times, Plaintiff's suit is brought in the context of the COVID-19 pandemic. Due to the pandemic, the Governor issued a statewide disaster declaration under the Texas Disaster Act on March 13, 2020. The Texas Disaster Act gives Governor Abbott sweeping powers for the duration of a declared disaster including allowing him to "suspend the provisions of any regulatory

---

[5] Defendants also argue Plaintiff lacks standing to bring claims on behalf of other voters or other candidates. ECF No. 13 at 8–9. But Plaintiff brings no such claims, and instead focuses both his complaint and his motion for preliminary injunction on injury to his own rights. *See, e.g.*, ECF No. 1 ¶¶ 80–83 (describing Plaintiff's "injury-in-fact").

statute…or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." TEX. GOV'T CODE § 418.016(a). Under these provisions, Governor Abbott could find strict compliance with the in-person signature requirement for independent candidates' petitions hinders necessary action to cope with the pandemic—i.e., social distancing and other measures necessary to slow the spread of the virus—and thus could suspend those provisions of the Election Code. Such action by the Governor would redress Plaintiff's injury, and in these circumstances Plaintiff's injury is traceable to the Governor.[6]

Defendants' standing arguments lack merit. The Court finds Plaintiff has sufficiently demonstrated Article III standing and that Governor Abbott is a proper party.

### b. Preliminary Injunction Analysis

Plaintiff argues he has a strong likelihood of success on the merits of his First Amendment claim because he "has no lawful procedure by which he may qualify as an independent candidate for Texas' November 3, 2020 general election ballot." ECF No. 3 at 8. Plaintiff argues that under the *Anderson-Burdick* framework, Texas' petitioning requirements "as applied here, cannot withstand constitutional scrutiny." *Id.* (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)). Defendants agree the *Anderson-Burdick* framework applies but argue that Plaintiff cannot show a likelihood of success on the merits because the state's

---

[6] Defendants argue the Fifth Circuit has recently rejected this basis for standing in a challenge to the Texas Election Code's mail-in voting provisions. ECF No. 13 at 7 (citing *Texas Democratic Party v. Abbott*, 961 F.3d 389, 400 (5th Cir. 2020). That case does not decide this one. There, the plaintiffs only pointed to "several of the Governor's actions that they believe demonstrate his 'extensive enforcement with respect to state elections,'" such as rescheduling election dates. *Id.* The Fifth Circuit merely held that it was "likely" the plaintiffs' injuries there—related to the administration of mail-in voting, traditionally done by local election officials—"cannot be fairly traced to" the Governor. *Id.* Plaintiff's injury here does not involve the practical administration of elections at the local level, but instead a "regulatory statute" or "rules" of the Secretary of State related to the signature requirements for all independent candidates. Such provisions are clearly within the reach of the Governor during a disaster declaration, as discussed above.

interests outweigh any purported challenge Plaintiff faces in complying with the Election Code's signature-gathering requirement. ECF No. 13 at 9.

The Court agrees with Defendants that Plaintiff has failed to demonstrate a substantial likelihood of success on the merits for his First Amendment claim. The Supreme Court has laid out the framework to evaluate First Amendment challenges to state election laws:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 789). The Supreme Court recognized in both *Burdick* and *Anderson* that not every election regulation—even those "tending to limit the field of candidates from which voters might choose"—invokes strict scrutiny. *Burdick*, 504 U.S. at 433.

Here, any burden on Plaintiff's First Amendment rights does not rise to the level of a constitutional violation. Plaintiff's allegation that complying with the signature-gathering requirement is "unlawful" is plainly wrong. Except for the period between March 24 and April 2 when San Antonio's stay-at-home order was in effect, Plaintiff has at no time been prohibited by law from gathering signatures. Plaintiff indeed testified that he (and others on his behalf) have collected around 200 signatures between March 4 and July 14, and that he would continue to attempt to collect signatures through the August 13 deadline. These facts do not support Plaintiff's contention that he faces a severe burden of "complete exclusion" from the ballot. ECF No. 3 at 12 (citing *Lee v. Keith*, 463 F.3d 763, 770 (7th Cir. 2006)).

Indeed, Plaintiff points to no state action attributable to either Defendant that prevents him from going door-to-door or petitioning in small gatherings for signatures. Under similar facts, the Sixth Circuit recently held:

> [J]ust because procuring signatures is now harder…doesn't mean that [Plaintiff is] *excluded* from the ballot…we cannot hold private citizens' decisions to stay home for their own safety against the State. Because the State has not excluded [Plaintiff] from the ballot, the burden imposed on [him] by the State's [ballot access] requirements cannot be severe.

*Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) (emphasis in original). As in *Thompson*, given "all [the] opportunities" Plaintiff had and still has "to exercise [his] rights," his burden is less than severe. *Id.*

Plaintiff relies on inapposite case law where courts provided relief because states failed to provide candidates and parties with a procedure by which they may qualify for the ballot. ECF No. 3 at 8. That is not the case here, where Texas has a clearly established procedure for Plaintiff to gain access to the ballot—Plaintiff must simply gather 500 signatures in support of his petition and file the same by August 13. Plaintiff argues "Texas is constitutionally required to provide its citizens with a lawful procedure to qualify for its general election ballot, and it has failed to do so." *Id.* at 10. As explained above, this contention is wholly without merit: no law or action attributable to either Defendant prevents Plaintiff from lawfully collecting signatures in support of his petition, which would grant him access to the ballot.

The less-than-severe burden Plaintiff faces is outweighed by the state's interest in regulating the ballot. The state has articulated its important interests in "requiring some preliminary showing of a significant modicum of support" for those on the ballot, *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), and in "winnowing out candidates" to avoid ballot overcrowding and voter confusion. *Burdick*, 504 U.S. at 439. These interests are sufficient to

justify the Texas Election Code's "reasonable nondiscriminatory restrictions" on ballot access. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). As Defendants point out, Texas' ballot-access laws have repeatedly been upheld as constitutional. *See American Party of Texas v. White*, 415 U.S. 767, 783 (1974) (upholding requirement that minor party candidates demonstrate support from 1% of the vote from last gubernatorial general election); *Nader v. Connor*, 388 F.3d 137, 137 (5th Cir. 2004) (per curiam) (affirming constitutionality of Texas' voter signature requirement and deadline for independent presidential candidates in TEX. ELEC. CODE § 192.32).

For these reasons, Plaintiff has not demonstrated a substantial likelihood of success on the merits of his First Amendment claim.[7] Plaintiff's failure to satisfy this requirement makes consideration of the remainder of the preliminary injunction standard unnecessary. *Steen*, 732 F.3d at 386 (noting that the "party seeking" preliminary injunction must "clearly carr[y] the burden of persuasion on all four requirements"). But even considering the remaining three requirements makes clear that Plaintiff cannot satisfy the preliminary injunction standard. Plaintiff's testimony that he has collected around 200 signatures and will continue to seek signatures through the August 13 deadline undercuts his claim of a substantial threat of irreparable injury. The Court could do nothing, and Plaintiff could succeed in gathering the required signatures and appear on the general election ballot. For the same reasons the state's important interests outweigh any harm to Plaintiff's rights, he also cannot demonstrate that his injury outweighs the threatened harm to Defendants. And finally, the public interest is served by the enforcement of the Election Code, and any interest

---

[7] In his complaint, Plaintiff also brings an Equal Protection claim under the Fourteenth Amendment. However, Plaintiff does not raise this claim as a basis for preliminary injunction. Thus, the Court finds it premature and unnecessary to address the merits of any Equal Protection claim at this time.

served by allowing Plaintiff to appear on the ballot does not weigh heavily enough in his favor to tip the preliminary injunction standard in his favor.

## CONCLUSION

For the reasons stated herein, Plaintiff's Motion for Preliminary Injunction (ECF No. 3) is **DENIED**.

It is so **ORDERED**.

**SIGNED** this 17th day of July, 2020.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE